**312**

PUERTO RICO MARITIME SHIPPING
AUTHORITY, Plaintiff,

v.

Elizabeth Hanford DOLE, Secretary of
Transportation; Harold E. Shear, Maritime Administrator; Warren G. Leback,
Deputy Maritime Administrator; and
Maritime Administration, United States
Department of Transportation; United
States Department of Transportation,
Defendants,

Aeron Marine Shipping Co., Aries Marine
Shipping Co., Atlas Marine Co., Aquarius Marine Co., American Shipping,
Inc., Pacific Shipping, Inc., and North
Oil Transport Co., Defendant-Intervenors.

MATSON NAVIGATION COMPANY,
INC., Plaintiff,

v.

The UNITED STATES of America and
Elizabeth Hanford Dole, Secretary of
Transportation, Defendants.

AMERICAN MARITIME
ASSOCIATION,
Plaintiff,

v.

The UNITED STATES of America; Elizabeth Hanford Dole, Secretary of Transportation; Harold E. Shear, Maritime
Administrator; and Warren G. Leback,
Acting Maritime Administrator, Defendants.

Civ. A. Nos. 85–660, 85–679 and 85–680.

United States District Court,
District of Columbia.

Aug. 1, 1985.

Amy Loeserman Klein, William E. Cohen, Washington, D.C., for plaintiff.

John H. Bayly, Jr., Asst. U.S. Atty., Washington, D.C., for defendants.

## MEMORANDUM OPINION AND ORDER

STANLEY S. HARRIS, District Judge.

These three consolidated cases are now before the Court on the motion of the plaintiff Puerto Rico Maritime Shipping Authority (PRMSA) for a preliminary injunction, the motion of the defendant-intervenors Aeron Marine Shipping Company, *et al.* (Aeron) for summary judgment, the motion of the federal defendants to dismiss, or alternatively, for summary judgment, and the motion of the plaintiffs American Maritime Association (AMA) and Matson Navigation Company (Matson) for injunctive relief and summary judgment. The plaintiffs seek judicial review of an opinion and order issued by the Secretary of Transportation on December 17, 1984, and a subsequent order on remand issued by the Acting Maritime Administrator on February 7, 1985. Plaintiffs challenge the approval under § 805(a) of the Merchant Marine Act, 46 U.S.C. § 1223(a), of the applications of seven companies (Aeron) operating subsidized tankers in foreign commerce for permission to affiliate with an entity that owns and proposes to operate a roll-on/roll-off vessel, ATLANTIC SPIRIT, in the domestic trade. Plaintiffs ask for a declaratory judgment and injunction prohibiting the operation of the ATLANTIC SPIRIT between destinations in Hawaii, Alaska, and Puerto Rico and destinations in the contiguous United States unless the defendants suspend payment of an operating-differential subsidy (ODS) to Aeron (or any affiliate, subsidiary, or holding company).

### I. *Background of the Controversy*

The Merchant Marine Act of 1936, as amended, 46 U.S.C. § 1101 *et seq.*, differs in its treatment of foreign and domestic commerce. Ships operated in domestic commerce must be built in the United States, documented under the laws thereof, predominantly staffed with United States crews and officers, and owned by United States citizens. Ships in domestic commerce compete only against other ships with equal constraints and the consequent costs of compliance. In contrast, the Act imposes no protective restrictions to ships operating in foreign commerce. Therefore, in order to offset the disadvantage of higher shipbuilding and operating costs of United States vessels built in the United States, the Merchant Marine Act provides subsidies to make the United States Merchant Marine competitive in the foreign trades. Domestic carriers such as the plaintiffs do not receive any federal subsidies.

To avoid unfair competition between subsidized and non-subsidized vessels, Congress provided that subsidized vessels could not operate in domestic trades except under limited circumstances with certain safeguards. Specifically, § 805(a) of the Merchant Marine Act states:

It shall be unlawful to award or pay any subsidy to any contractor under authority of subchapter VI of this chapter, or to charter any vessel to any person under subchapter VII of this chapter, if said contractor or charterer, or any holding company, subsidiary, affiliate, or associate of such contractor or charterer, or any officer, director, agent, or executive thereof, directly or indirectly, shall own, operate, or charter any vessel or vessels engaged in the domestic intercoastal or coastwise service, or own any pecuniary interest, directly or indirectly,

in any person or concern that owns, charters, or operates any vessel or vessels in the domestic intercoastal or coastwise service, without the written permission of the Secretary of Transportation. Every person, firm, or corporation having any interest in such application shall be permitted to intervene and the Secretary of Transportation shall give a hearing to the applicant and the intervenors. The Secretary of Transportation shall not grant any such application if the Secretary of Transportation finds it will result in unfair competition to any person, firm, or corporation operating exclusively in the coastwise or intercoastal service or that it would be prejudicial to the objects and policy of this chapter: *Provided,* That if such contractor or other person above-described or a predecessor in interest was in bona-fide operation as a common carrier by water in the domestic, intercoastal, or coastwise trade in 1935 over the route or routes or in the trade or trades for which application is made and has so operated since that time or if engaged in furnishing seasonal service only, was in bona fide operation in 1935 during the season ordinarily covered by its operation, except in either event, as to interruptions of service over which the applicant or its predecessor in interest had no control, the Secretary of Transportation shall grant such permission without requiring further proof that public interest and convenience will be served by such operation, and without further proceedings as to the competition in such route or trade.

If such application be allowed, it shall be unlawful for any of the persons mentioned in this section to divert, directly or indirectly, any moneys, property, or other thing of value, used in foreign-trade operations, for which a subsidy is paid by the United States, into any such coastwise or intercoastal operations; and whosoever shall violate this provision shall be guilty of a misdemeanor.

46 U.S.C. § 1223(a). Under the statute, then, no application for participation in the domestic trades shall be granted if the Secretary of Transportation finds it will result in unfair competition to any person, firm, or corporation operating exclusively in the coastwise or intercoastal service or that it would be prejudicial to the objects and policy of the Act.

In 1982, Acadian Shipping Corporation, an unsubsidized company affiliated with Aeron and six other ODS contractors, applied for permission to own and operate the ATLANTIC SPIRIT in domestic trade.[1] The application sought permission covering the entire domestic trade, although the only intended operation was to be along the Atlantic coast. Several parties intervened, including each of the plaintiffs, and participated in the application process before an Administrative Law Judge. The ALJ concluded that since none of the ODS money received by Acadian affiliates would likely be diverted to the ATLANTIC SPIRIT's operation, the granting of the application would not result in unfair competition. Diversion would be impossible, according to the ALJ, because (1) the subsidy paid for out-of-pocket expenses already incurred, (2) the domestic vessels were operated separately from the foreign subsidized vessels, and (3) no residual subsidy would remain passively after proration from the subsidized operations to assist the separate unsubsidized operation.[2]

The ALJ went on to hold, nevertheless, that the grant of the application in regard to the trade between Puerto Rico and the United States would result in prejudice to the objects and policy of the Act. Operation in other domestic trades was permitted but limited to three years. The ALJ relied on a stipulated factual scenario that if the ATLANTIC SPIRIT were operated in the Puerto Rico trade, it would always operate

---

**1.** The ATLANTIC SPIRIT, previously owned by a bankrupt carrier, was held at the time of application by the United States pursuant to a first preferred mortgage. A buyer for the vessel had been sought since foreclosure in 1978.

**2.** *See* Initial Decision, Administrative Law Judge at 21–22 (Aug. 5, 1983) (Record at 3026, 3046–47).

at 100% capacity and would draw all its cargo from cargo presently carried by PRMSA.[3] Under the stipulation, the ALJ found that PRMSA's financial losses would increase[4] and if PRMSA were thereby forced to cease operations the long-term prospects were for the eventual elimination of the current level of service to Puerto Rico. The ALJ found that the trade was highly competitive and currently over-tonnaged with the result that existing carriers had net losses or only minimal profits.

Upon review, the ALJ's initial decision was affirmed by the Maritime Administrator. The Administrator considered whether unfair competition could result from factors other than diversion of subsidy funds, but found that there was no evidence that the ATLANTIC SPIRIT's owners would benefit from an inherent stability resulting from affiliation with subsidized operators or that below-cost cutthroat rates would be offered by the ATLANTIC SPIRIT.[5] He went on to conclude that the ALJ was correct in his reliance on evidence of adverse impact upon existing operators and upon service to Puerto Rico in reaching his conclusion as to prejudice to the objects and policy of the Act. Finally, the Administrator held that there was no evidence that operation of the ATLANTIC SPIRIT in the Alaskan and Hawaiian trades would not also result in prejudice to the objects and policy of the Act. Therefore, he denied permission to operate in the Puerto Rican, Alaskan, and Hawaiian trades.

After the ATLANTIC SPIRIT was purchased, Aeron petitioned the Secretary of Transportation for review of the Administrator's decision. The Secretary elected to review the decision despite PRMSA's argument for dismissal on the grounds that the Secretary had delegated final decision making authority to the Administrator without reservation.[6] The Secretary overturned the Administrator's decision as to Alaska and Hawaii and remanded as to Puerto Rico.[7] She found that Aeron had been erroneously subject to the burden of proving a negative, *i.e.*, that operation of the ATLANTIC SPIRIT would not prejudice the objects and policy of the Act. She found that the correct placement of the burden of proof was only initially with Aeron to show that its domestic vessels would not benefit from ODS funds; the burden then shifted to PRMSA or any other intervenor to show that the overall service to the trade would be harmed. This was, in effect, a new standard for determining prejudice to the Act's objects and policy since it looked to the long-term adverse impact upon projected service in the trade as a whole rather than the immediate impact upon the existing individual vessel operators. She went on to find that, under this standard, the previous decisions contained insufficient evidence to support the findings of long-term adverse impact. Accordingly, she remanded the case to the Administrator solely for the purpose of determining whether the record contained evidence to support the ALJ's and Administrator's findings.

On remand, the Administrator held that the record had no such evidence and, in accordance with the Secretary's instructions, he granted Aeron's application for operation of the ATLANTIC SPIRIT in the United States/Puerto Rico trade.[8]

The instant action was filed February 25, 1985. PRMSA's motion for a temporary

---

**3.** Aeron offered no detailed evidence as to the operation of the ATLANTIC SPIRIT at the hearing. The stipulation was applicable to any of the intervenors in the application process which included the three plaintiffs here. *See* Transcript of Prehearing Conference of April 7, 1983, at 7 (Record 477, 483); Plaintiff's Exhibit 34.

**4.** At the time this action began, PRMSA was operating with a cumulative deficit of $125,718,-000.

**5.** Final Opinion and Order, Maritime Administrator at 31–33 (Dec. 7, 1983) (Record at 3400).

**6.** Secretarial Order *re:* Request for Secretarial Review (June 29, 1984) (Record at 3628).

**7.** *See* Opinion and Order, Secretary of Transportation at 3 (Dec. 17, 1984) (Record at 3816).

**8.** Order on Remand from Secretary of Transportation, Maritime Administrator (Feb. 8, 1985) (Record at 3937).

restraining order was denied and the Court consolidated for hearing PRMSA's motion for a preliminary injunction and all of the parties' opposing dispositive motions.

## II. *Procedural Challenge*

### A. *The Secretary's Authority*

■ Section 805(a) provides the Secretary of Transportation the authority to grant or deny applications filed under that section. The Secretary delegated broad authority to the Maritime Administrator to carry out the Merchant Marine Act except for those functions expressly delegated to the Maritime Subsidy Board. *See* 49 C.F.R. §§ 1.66, 1.67. PRMSA contends that the lack of reservation of Secretarial review authority[9] and of specific procedures for review with regard to actions of the Administrator, in contrast to the actions of the Board,[10] preclude the Secretary from reviewing the Administrator's actions in this case.

In her opinion of December 17, 1984, the Secretary stated that it "has been the long established and consistently followed position of the Department of Transportation that the decisions of each of its Administrators are subject to Secretarial review, unless statute or regulation specifically deprive the Secretary of this right of review." She conceded that authority for day-to-day policy decisions in this specific program area had been delegated to the Administrator, but she asserted her continuing "responsibility of carrying out the duties of section 805(a)" and "the added responsibility of providing policy leadership in transportation matters for the entire Department, 49 U.S.C. 301."

The Court agrees with the Secretary's characterization of her overriding authority in matters of transportation policy. While there is no question that the authority for the day-to-day administration of the Merchant Marine Act has been delegated, what

has not been and cannot be delegated and what has been exercised by the Secretary in this case is her authority over the policy and direction of the Transportation Department. The Secretary did no more than provide the Administrator with an interpretation of § 805(a) in line with the policies currently directing the Transportation Department. She did not set aside the Administrator's decision. Instead, she directed the Administrator to re-examine the evidence to be certain that it supported PRMSA's claim that there would be a long-term adverse impact upon service in the Puerto Rico trade if the ATLANTIC SPIRIT began operating. This was a minimal interference with the Administrator's delegated authority. Furthermore, since the Administrator made the final decision upon review of the evidence no substantial rights of PRMSA were violated.

■ The Secretary's delegation of authority was not intended to confer procedural benefits.

> [I]t is always within the discretion of ... an administrative agency to relax or modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it."

*American Farm Lines v. Black Ball Freight Service,* 397 U.S. 532, 539, 90 S.Ct. 1288, 1292, 25 L.Ed.2d 547 (1970) (citations omitted). The delegation merely promoted administrative efficiency. Where, as here, national transportation policy is directly affected, the ends of justice require a relaxation of the usual procedure.

The cases cited by PRMSA which disallowed modification are distinguishable in that the important procedural benefits derived from the delegations involved in those cases justified the strict adherence to the separation of authority. In *Service v.*

---

**9.** At the time of the Secretary's review in this case, 49 C.F.R. § 1.43(a) read: "All powers and duties that are not delegated by the Secretary in this subpart, or otherwise vested in officials other than the Secretary, are reserved to the Secretary." Subsequent to the Secretary's decision, the section was amended to add the sen-

tence: "Except as otherwise provided, the Secretary may exercise powers and duties delegated or assigned to officials other than the Secretary."

**10.** *See* 46 C.F.R. Part 202.

*Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957), the Supreme Court upheld a regulatory procedure created specifically to protect the rights of employees undergoing loyalty and security checks. Similarly, in *United States ex rel. Accardi v. Shaughnessey,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954), the Court found that due process had been denied when the Attorney General issued a list of people he wanted deported before the Immigration Board had exercised the independent discretion delegated to it to make immigration decisions. Finally, in *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), Congress established and the Supreme Court upheld a unique delegation of authority to the Special Prosecutor to allow him to exercise his judgment independent of the influence of the Attorney General or the President during the Watergate trials.

In an attempt to show that procedural rights were sacrificed when the case was reviewed by the Secretary, PRMSA raises the possibility of *ex parte* dealings between the defendants. Since there are no Secretarial review procedures for decisions of the Maritime Administrator, PRMSA expresses its anxiety that the Agency may not have felt itself bound by any constraints so as to keep the Secretarial review process fair. As the basis for its fear, PRMSA cites a statement from the Government's brief indicating that the ATLANTIC SPIRIT was sold to Aeron "subject in part, to final disposition of the Section 805 dispute." · This, PRMSA suggests, reflects Aeron's unwillingness to buy unless the dispute was resolved in their favor.

■ The Court first finds that the statement does not reflect a contingency on the sale. The owners of the ATLANTIC SPIRIT imposed no conditions on their purchase.[11] Though somewhat inartfully

worded, the statement merely reflects that the vessel remained subject to the disposition of the § 805(a) application after its sale to Aeron's affiliate. The Court further finds that PRMSA has not shown convincingly that such *ex parte* contacts occurred or that the Secretary did not follow the regulations against *ex parte* contacts applicable to other instances of Secretarial review. *See, e.g.,* 46 C.F.R. Part 202.

### B. *Denial of Full and Fair Hearing*

PRMSA contends that it was denied due process because of "unreasonable time strictures, the denial of discovery of information which the Administrator ultimately deemed central to PRMSA's required showing, and the arbitrary rejection, without explanation, of PRMSA's petition to reopen for consideration of new and highly relevant facts concerning unfair competition."[12]

The Court has considered the time schedule under which discovery was conducted. The hearing process was somewhat foreshortened in that the Administrative Law Judge was directed to conduct a hearing and render a decision within 45 days. The Administrator later granted an extension of 30 days for discovery.

■ The Court finds that the discovery deadlines were reasonable in light of the circumstances of the case. Aeron's application was a part of a previous proceeding which was later withdrawn in which PRMSA had intervened.[13] Extensive discovery had already been accomplished on relevant § 805(a) issues in the previous case. While certain issues involved in the new application had not been addressed, PRMSA has not established a need for discovery beyond that accomplished in the additional time period allowed by the Administrator.

---

11. Affidavit of Philip J. Shapiro, Vice President and Secretary of Athena Marine Shipping Company, filed Mar. 26, 1985.

12. Plaintiff's reply to opposition of defendants and of defendant-intervenors to motion for preliminary injunction and summary judgment and plaintiff's memorandum in opposition to motions of defendants and defendant-intervenors for summary judgment at 18, filed Mar. 19, 1985.

13. Docket No. S–715.

PRMSA asserts several areas into which it would have liked to conduct discovery such as the financial records of Aeron's unsubsidized vessels. The Court finds that such discovery would have been cumulative and tangential. Some of the information could have been obtained through extrapolation of PRMSA's own operating costs. In other areas, PRMSA was given wide latitude for discovery. For example, it was free to analyze 15,000 pages of Aeron's financial records. While discovery must be granted where a refusal to do so would so prejudice a party as to deny him due process, "[t]here is no basic constitutional right to pretrial discovery in administrative proceedings." *McClelland v. Andrus*, 606 F.2d 1278, 1286 (D.C.Cir.1979); *Silverman v. Commodity Futures Trading Comm'n*, 549 F.2d 28, 33 (7th Cir. 1977). The Court concludes that PRMSA was not prejudiced by the Administrator's discovery rulings and there was no abuse of his discretion in making such rulings. There was sufficient discovery such that the relevant information was before the parties and the agency in considering this case.

Another of PRMSA's procedural contentions is that the Secretary ignored its unfair competition claims when she accepted review of the matter. It bases this contention on the fact the Secretary made no mention of the unfair competition issue in her Opinion and Order. The Court concludes that the Secretary's determination that these specific claims did not constitute a significant legal or policy question was within her discretion to determine the scope of review.

PRMSA's final improper procedural contention challenges the Administrator's denial of PRMSA's request to reopen the record upon remand. PRMSA alleges that the record should have been reopened for additional evidence as to the issue of unfair competition when it became known that Pacific Shipping, Inc., a subsidized entity owned by Aeron, would become a part owner of Acadian, the company operating the ATLANTIC SPIRIT. This change in the financial arrangement occurred after the record closed.

The Administrator denied PRMSA's petition without explanation, stating that the matter was not properly before him. Based on the Secretary's limited review of specified issues, which did not include unfair competition, the Administrator exercised his discretion and issued the denial. The reopening of agency records is a matter entrusted to agency discretion. *See Delta Air Lines, Inc. v. C.A.B.*, 561 F.2d 293, 306-07 (D.C.Cir.1977). The Court finds no abuse of this discretion since there was no compelling cause to reopen. First, as noted by the Administrator on remand, the Maritime Subsidy Board had authorized Pacific Shipping to terminate its ODS contract when it completed the existing voyages prior to delivery of the subsidized vessel to the Navy, which was to be in the near future. Pacific Shipping was going to use the proceeds from the sale of the subsidized vessel to repay the loans for the purchase of the ATLANTIC SPIRIT, which is an indirect investment of the same type already examined and approved by the agency and the Court. Second, the Court agrees with the defendants' characterization of Pacific Shipping's influence on and interest in the ATLANTIC SPIRIT as little more than that of a stockholder. The Court agrees that Pacific "is a limited partner in a limited partnership which is one of the general partners of Acadian, the owner of the vessel." [14]

## III. *The Merits*

Section 805(a) would disallow the payment of a subsidy to any firm that indirectly or directly owns or operates any vessel engaged in the domestic trades or who owns any pecuniary interest, indirectly or directly, in any concern that owns, charters, or operates any vessels in the domes-

---

14. Memorandum of defendant-intervenors in opposition to motion for preliminary injunction and in support of defendant-intervenors' motion for summary judgment at 43, filed March 11, 1985.

tic trades unless the Secretary gives written permission. The application for permission will not be granted if the Secretary finds that (1) it will result in unfair competition to any person, firm, or corporation operating exclusively in domestic trade, *i.e.,* unsubsidized vessels, or (2) it would be prejudicial to the objects and policy of the Act.

### A. *Unfair Competition*

■ PRMSA repeatedly raised the issue of unfair competition throughout the administrative proceeding but, as discussed previously, the Secretary did not accept it for review. The ALJ found that unfair competition would not result if Aeron's application were granted because there was no possibility of subsidy diversion to domestic operations. The Administrator looked beyond the diversion to other factors that could result in unfair competition but found no evidence of such. The Secretary determined that § 805(a) "was primarily designed to prevent unsubsidized carriers from diverting their ODS funds to vessels in the domestic trade, so as to prevent unfair competition with unsubsidized vessels in that trade." [15]

PRMSA has brought the issue of unfair competition once again for this Court to consider. PRMSA alleges that there is a likelihood of diversion from Aeron to its unsubsidized affiliates and that beyond diversion, an inherent advantage of stability will inure to the benefit of the affiliates from Aeron's subsidized status such that unfair competition will result.

The current interpretation of the unfair competition clause requires a causal link between the alleged unfair competition and the subsidy received by the affiliate. That is, some part of the subsidy must be passed onto the domestic operation and a benefit must be conferred thereby sufficient to result in unfair competition. *See Pacific Far East Line v. F.M.B.,* 275 F.2d 184, 186 (D.C.Cir.1960), *cert. denied,* 363 U.S. 827, 80 S.Ct. 1597, 4 L.Ed.2d 1523 (1960); *Matson Navigation Co. v. Connor,* 258

F.Supp. 144, 155 (N.D.Cal.1966), *aff'd per curiam,* 394 F.2d 514 (9th Cir.1968). Advantages of subsidized companies which are unrelated to subsidy diversion are irrelevant to the determination of unfair competition. Were it otherwise, no § 805(a) application could ever be approved because every subsidized company's affiliate would be an unfair competitor.

The Court finds that PRMSA's allegations of unfair competition do not specifically concern or demonstrate subsidy or subsidy-related transfers of funds. For example, if any diversions are made possible by Aeron's structure they would consist of non-subsidy funds since residual subsidy funds cannot remain passively to be transferred to non-subsidized vessels. It follows, then, that non-cost based payments for services rendered by non-subsidized vessels are not violative of § 805(a) since the payments would not be from subsidy funds. As to the inherent stability gained from affiliation with Aeron, PRMSA assumes that subsidy payments will guarantee profitability for Aeron such that it and its affiliates will gain long-term staying power. PRMSA does not explain how profitability is guaranteed when the subsidies merely offset costs not incurred by foreign competitors, thereby allowing American vessels to compete as any other ship in the foreign trade. Neither it nor Aeron is guaranteed profits. PRMSA also does not demonstrate convincingly that Aeron's domestic affiliate will benefit from Aeron's stability. Finally, PRMSA did not explain how whatever stability indirectly gained from Aeron would outweigh the direct subsidies which PRMSA receives from Puerto Rico such that unfair competition would result.

### B. *Objects and Policy*

■ Beyond unfair competition, prejudice to the objects and policy of the Merchant Marine Act mandates the denial of a § 805(a) petition. As guidance, the Act's Declaration of Policy states at § 101:

---

**15.** Opinion and Order, Secretary of Transportation at 4 (Dec. 17, 1984) (Record at 3819).

It is necessary for the national defense and development of its foreign and domestic commerce that the United States shall have a merchant marine (a) sufficient to carry its domestic water-borne commerce and a substantial portion of the water-borne export and import foreign commerce of the United States and to provide shipping service essential for maintaining the flow of such domestic and foreign water-borne commerce at all times. * * * It is declared to be the policy of the United States to foster the development and encourage the maintenance of such a merchant marine.

Thus, the Secretary must determine how entry of the vessel would affect the goal of maintaining the flow of domestic commerce at all times. The Court disagrees with Aeron's interpretation of the objects and policy clause which would allow review of the vessel's effect only to the extent it results from subsidy funds. While the aspect of subsidy funds is important to the determination of unfair competition, the causal link need not be shown again with regard to the objects and policy clause. Once it is determined that subsidy funds do not benefit the unsubsidized affiliates vessel, the Secretary must look to the effect of the entry of the vessel itself on the trade. To read § 805(a) otherwise would be to read the objects and policy clause out of the section, because once subsidy transfers are found to be improbable under the unfair competition clause, it is a foregone conclusion that they will have no effect on the domestic trade. The possibility of subsidy transfers merely trips the trigger of a § 805(a) analysis such that the entry of the vessel is subject to more careful scrutiny. *See* Opinion and Order, Secretary of Transportation at 7 n. 3 (Dec. 17, 1984) (Record at 3821).

▮ It is well settled that § 805(a) should not be used to protect existing domestic operators from fair competition posed by new entrants to the trade, even if the new entrants are affiliates of subsidized operators. *See, e.g., Pacific Far East Line v. F.M.B.,* 275 F.2d at 186; *American Export Isbrandtsen Lines, Inc.,*

9 SRR 997 (MSB/MA 1968). With pro-competitive principles in mind, the Secretary determined that the appropriate inquiry under the objects and policy clause was whether entry would result in a long-term significant adverse impact on projected service in the affected trade. As PRMSA asserts, short-term economic dislocation or a temporary adverse impact may result from an approved entry under the Secretary's standard. However, the Secretary has shown that the long-term view is more likely to accomplish the objectives of the Act. At the present time, the domestic service in Puerto Rico is overtonnaged, unstable, and inefficient. A short-term disruption resulting from the addition of an efficient competitor may result in a more vigorous merchant marine such that the domestic trade is better served. It is well within the Secretary's broad and substantial discretion in administering the Act to determine that the best way to achieve the objects and further the policy of the Act is by increasing the opportunity for competition in the domestic trades with an eye to the long-term effect.

▮ The Secretary correctly placed the burden of proof on the intervening parties, PRMSA, Matson, and AMA, to show prejudice to the objects and policy of the Act. The ALJ had initially placed the burden with them but the Administrator reversed the ALJ. The Court agrees with the Secretary's conclusion that while the initial burden of proof to show that the proposed domestic operation will not result in unfair competition should be on the applicants, the burden should shift to the intervenors to prove that the proposed affiliation will prejudice the objects and policy of the Act. The Secretary reasoned that the intervenors would likely be more "able to show that the overall service to the trade will be harmed than the applicant, who may not have access to critical information regarding the capacity and financial position of the intervenors." Furthermore, placement of the burden on the applicants would require the proving of two negative conditions, *i.e.,* that no unfair competition would

**322**

result from entry and that there would be no prejudice to the Act's objects and policy. The Secretary's placement of the burden is in keeping with the latest administrative decisions that specifically define the elements of a prima facie case. *See, e.g., States Marine Lines,* 1 SRR 325, 326c–326d (FMB 1961).

In applying the substantive standard, the Secretary determined that the evidence did not support the decisions of the ALJ or the Administrator. The ultimate withdrawal of PRMSA as a result of the entry of the ATLANTIC SPIRIT was never proven. Inferences were drawn from the precarious financial posture in which it presently sits and the substantial increase in losses it expected in the future. However, much of PRMSA's arguments were based on a hypothetical assumption that the ATLANTIC SPIRIT would operate full time in the Puerto Rico trade and would transport full boatload cargoes otherwise carried by PRMSA. There was no convincing showing whether PRMSA would withdraw or go out of business or that new vessels would not enter to fill any voids consequently created. It is unreasonable to assume that insufficient shipping capacity and permanent damage to the trade would result from any action taken by PRMSA since government studies introduced into the administrative record show that at no time during the past 30 years has there been inadequate service in the Puerto Rico trade.

In conclusion, the Secretary was fully within her discretion in her interpretation of the objects and policy clause as being concerned with the long-term adverse impact on domestic commerce. Furthermore, the burden of proving prejudice to the objects and policy of the Act was correctly placed on the intervenors. Finally, the Court concludes that the evidence was insufficient to show that the Puerto Rican shipping trade would be adversely affected by the entry of the ATLANTIC SPIRIT.

Accordingly, it hereby is

ORDERED, that the plaintiffs' motions for summary judgment and for injunctive relief are denied. It hereby further is

ORDERED, that the defendants' and the defendant-intervenors' motions for summary judgment are granted and the cases are dismissed.

SO ORDERED.